UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| **Edward M. Williams**<br>**c/o Vasseghi Budd PLLC**<br>**9663 Main Street, Suite A**<br>**Fairfax, VA 22031**<br><br>　　　**Plaintiff,**<br><br>　　v.<br><br>**Fairfax County Government**<br>**SERVE:**<br>**Elizabeth D. Teare, County Attorney**<br>**Office of the County Attorney**<br>**12000 Government Center Parkway, Suite 549**<br>**Fairfax, VA 22035**<br><br>　　**and**<br><br>**Fairfax County Department of Family Services**<br>**SERVE:**<br>**Elizabeth D. Teare, County Attorney**<br>**Office of the County Attorney**<br>**12011 Government Center Parkway**<br>**Fairfax, VA 22035**<br><br>　　**Defendants.** | **Case No.:** _____ |

## COMPLAINT

Plaintiff, Edward M. Williams ("Plaintiff" or "Mr. Williams"), by and through counsel, submits the following Complaint against Defendants Fairfax County Government (the "County") and Fairfax County Department of Family Services ("DFS") (collectively, "Defendants") and states the following in support of the same:

1

**PRELIMINARY STATEMENT**

1.      This is an action brought by Plaintiff against Defendants for damages arising out of violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (42 U.S.C. § 2000e).

2.      Defendants hired Plaintiff in July 2019 as a Social Services Supervisor. During Plaintiff's tenure at DFS, Plaintiff had satisfactory job performance and was on track to become a permanent employee. Despite Plaintiff's satisfactory performance with little support, Defendants discriminated against him because of his sexual orientation and retaliated against him. Defendants then summarily fired Plaintiff.

**THE PARTIES**

3.      Plaintiff Edward M. Williams is an individual who resides in Columbia, South Carolina. Plaintiff is a citizen of South Carolina. Plaintiff is an openly gay male and is married to a man.

4.      Defendant Fairfax County is a municipality in corporate form, organized and existing under the laws of the Commonwealth of Virginia, and has an administrative subunit/subdivision, entity, or administrative arm, the Fairfax County Department of Family Services.

5.      Defendant DFS is a County government agency organized and existing pursuant to the laws and policies of the Commonwealth of Virginia and the Defendant County.

6.      Defendants were, at all relevant times, Plaintiff's "employer" within the meaning of all relevant Federal, State and local laws.

7.      Plaintiff was, at all relevant times, Defendants' "employee" within the meaning of all relevant Federal, State and local laws.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617, in that this is a civil action arising under the laws of the United States.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue is also proper in this district under 42 U.S.C. § 2000e-5(f)(3), because the unlawful employment practices were committed in the Eastern District of Virginia. Specifically, they occurred in Fairfax County, Virginia.

## CONDITIONS PRECEDENT AND PREREQUISITES TO SUIT

10.    All conditions precedent to filing the instant action have been fulfilled.

11.    Pursuant to Va. Code § 15.2-209, Plaintiff served the County with notice of his claims on December 8, 2020.

12.    The County Attorney acknowledged receipt of Mr. Williams' notice of claims on January 25, 2021.

13.    On or around January 22, 2021, Plaintiff filed a timely Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission ("EEOC").

14.    On April 28, 2023, after concluding its investigation into Plaintiff's Charge, the EEOC issued Plaintiff a Notice of Right to Sue.

15.    This complaint is being filed within 90 days of Plaintiff receiving his Notice of Right to Sue.

16.    Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.

3

## FACTUAL BACKGROUND

### Mr. Williams Flourishes in His Prior Job with the
### District of Columbia's Department of Family Services

17.     Prior to being hired by Defendants, Mr. Williams worked for the District of Columbia's Child Protective Services ("DC CPS") as a Program Manager.

18.     Prior to that, Mr. Williams worked as an evening shift supervisor for DC CPS. In that position, in addition to his job duties, Mr. Williams created a curriculum for a DC CPS training department.

19.     Because of his stellar work and contributions, Mr. Williams was subsequently elevated to a Training Supervisor for DC CPS. In that role Mr. Williams provided one on one training, teaching and shadowing opportunities for newly hired DC CPS employees on polices, procedure and protocols of the DC CPS. Mr. Williams was also responsible for recruitment.

20.     Ultimately, Mr. Williams was promoted to a Program Manager position with DC CPS, managing the evening shift. In this position, Mr. Williams supervised five (5) independently licensed supervisors, who were each responsible for 5 social workers . Mr. Williams held this role for over a year until he began work for Defendants.

### Mr. Williams is Hired by the Fairfax County Department of Family Services

21.     On July 22, 2019, Mr. Williams was hired as a Child Protective Services ("CPS") Supervisor for the County in the DFS' Children, Youth and Families ("CYF") Division.

22.     Mr. Williams came to his position with DFS with 11 years of child welfare experience.

23.     As a CPS Supervisor, Mr. Williams was required to oversee daily operations related to the CPS investigative response for family assessments and investigations in accordance with

guidelines set forth in CYF and Part C, Chapter 4 of the Virginia Department of Social Services ("VDSS") *Child and Family Services Manual*.

24.    The position of CPS Supervisor is a merit position.

25.    Mr. Williams' position was subject to a probationary period of one (1) year before he gained merit status.

26.    Mr. Williams' direct supervisor was Karen DeMijango, a CPS and Protection and Preservation Services ("PPS") Program Manager within DFS's CYF Division.

27.    During Mr. Williams' panel interview, he disclosed that he is gay.

**Mr. Williams Receives Inadequate Training and Support in His New Job**

28.    Mr. Williams was inadequately trained by Defendants during his probationary period and not provided sufficient resources and guidance to become effective in his new position.

29.    Ms. DeMijango was responsible for providing Mr. Williams with "continuous supervision to include one-on-one coaching, shadowing, and intervention sessions."

30.    Shortly after Mr. Williams began his employment with the County, Ms. DeMijango left for two (2) weeks of annual leave, and Mr. Williams was assigned five (5) social service specialist caseloads.

31.    This size caseload was concerning to Mr. Williams because his most recent social service and program manager experience had been in a similar position in the District of Columbia and each jurisdiction has different laws, regulations, and local policies and procedures and he would be operating in a new jurisdiction with no supervision or guidance.

32.    However, even after Ms. DeMijango returned from her vacation, she did not have a strong presence in Mr. Williams' building and was not available to provide him with the support, training, and supervision he needed during his probationary period with the County.

5

33.    Throughout Mr. Williams' tenure with the County and DFS, Ms. DeMijango refused to make herself available and was not actively involved in Mr. Williams' training during his probationary period.

34.    As Mr. Williams' direct supervisor, Ms. DeMijango had a duty to ensure that Mr. Williams received adequate training during his probationary period.

35.    However, as it became clear that Ms. DeMijango would remain inaccessible, and because of his unfamiliarity with Fairfax's DFS procedures and protocols, Mr. Williams inquired about receiving additional support in his new position.

Mr. Williams expressed his concerns to Ms. DeMijango. As a result of a discussion with Ms. DeMijango and other Program Managers at DFS regarding learning and excelling in his new position, Mr. Williams was subsequently assigned a coach, Sonia Aranow.

### Sonia Aranow Begins "Coaching" Mr. Williams

36.    DFS routinely assigned "coaches" to new supervisory employees to assist the employees with learning DFS procedures and with acclimating to their new roles.

37.    Ms. Aranow, Mr. Williams' "coach," was a former Senior Social Services Supervisor with the County.

38.    As his assigned coach, Ms. Aranow was a person whom Mr. Williams considered to be his superior.

39.    Mr. Williams was open about his sexual orientation and the fact that he was married to a man with Ms. Aranow, as well as his other colleagues.

40.    Ms. Aranow would often sit in on Mr. Williams' supervision meetings with his staff.

41.     During these meetings, Ms. Aranow frequently interrupted Mr. Williams to tell him why he was wrong, in front of his staff, but provided no meaningful coaching or suggestions for improvement.

42.     Specifically, Ms. Aranow was highly critical of Mr. Williams and provided no constructive feedback or coaching on Mr. Williams' performance. Instead, she constantly questioned his assessment of cases in front of his staff.

43.     While Ms. Aranow was assigned to Mr. Williams to support him and to help him succeed in his position with the County, as time went on, it became apparent that she was not an effective coach. Examples of Ms. Aranow's ineffectiveness as a coach include, but are not limited to the fact that:

a.  Ms. Aranow was argumentative;

b.  Ms. Aranow would intentionally chastise Mr. Williams in front of his staff during supervision meetings; and

c.  Instead of guiding Mr. Williams, Ms. Aranow would simply tell Mr. Williams her assessment of a case and she was not open to discussion on her assessment. It was her way or the highway.

44.     This hostile behavior from Ms. Aranow continued for months and was demoralizing to Mr. Williams.

45.     Further, at times, Ms. Aranow appeared fatigued and disengaged.

46.     However, as she was assigned to Mr. Williams and was essentially the only resource that he had, Mr. Williams did his best to work with Ms. Aranow and gain any knowledge he could to succeed in his position.

47.    Ms. Aranow was also responsible for giving Ms. DeMijango feedback on Mr. Williams' performance.

48.    In November 2019, despite Ms. Aranow's harsh criticism of his work, Mr. Williams requested that Ms. Aranow remain as his coach because he needed guidance and support to continue to succeed in his position with DFS, which he was not getting from his supervisor, Ms. DeMijango, who continued to remain inaccessible to Mr. Williams.

49.    That same month, in November 2019, Mr. Williams made an appointment with Oriane Eriksen, CYF Division Director, due to concerns about the lack of support he was receiving from Ms. DeMijango, and how her approach was undermining his ability to do his job, his credibility with his staff, and creating divisions within his unit.

50.    Mr. Williams also informed Ms. Eriksen that he felt that Ms. Aranow's approach was demeaning and degrading, and that her behavior similarly undermined Mr. Williams in front of his staff.

51.    Ms. Eriksen responded that Mr. Williams had asked for help, so he needed to "buckle down and accept the help [the County has] given him."

52.    No positive change occurred as a result of Mr. Williams' meeting with Ms. Eriksen.

53.    Defendants never conducted an investigation into Mr. Williams' concerns regarding Ms. Aranow's conduct and treatment of him.

### Mr. Williams Met All Expectations Despite Not Receiving Adequate Training or Support

54.    Despite having not received adequate training or support, both during his tenure and prior to being placed on administrative leave in April 2020, Mr. Williams met all expectations and never received any negative feedback on his job performance.

55.    As of 2020, Mr. Williams had been a social worker for 17 years.

8

56.     Mr. Williams met all expectations in his mid-year review from the County in January 2020, which was completed by Ms. DeMijango. Specifically, Mr. Williams received "Meets-Development Opportunity" in all areas of review in his mid-year review.

57.     Further, Ms. DeMijango even noted the following as strengths in Mr. Williams' mid-year review:

a.     "Edward has good clinical skills as it related to child safety. He applies proper judgment and critical thinking to high-risk CPS referrals and involves the necessary staff to keep the children safe. He has also established good working relationships with stakeholders such as county attorneys and staff from other programs. Currently, Edward's team has zero referrals in the backlog."

b.     "Edward has an outgoing personality and has established positive relationships with several staff in CYF and in other departments."

c.     "Edward has found a way to structure his supervisions with staff, meet deadlines, and also has a way to keep cases in his radar that require attention."

d.     "Edward has taken feedback and applied it in a positive way."

e.     "Edward has assessed high-risk CPS referrals and brought it to his program manager and county attorney's attention and has made proper recommendations that align with the agency's goals and responsibilities."

f.     "Edward has filed petitions in court and also testified and received positive feedback on how he represented the department."

g.     "Edward communicated with his program manager regarding any needs he or any of his staff needed."

9

58.     Even on areas of development cited by Ms. DeMijango, she stated in each category that Mr. Williams should "continue to…" which indicated that Mr. Williams was already improving in cited areas.

59.     The mid-year review even noted that Mr. Williams was "[e]ligible for a performance-based increase if funded."

60.     During his meeting with Ms. DeMijango to go over the mid-year review and discuss his performance, Ms. DeMijango communicated to Mr. Williams that he was on track for a permanent supervisory position with CPS.

61.     Ms. DeMijango did not mention that Mr. Williams was in danger of losing his position, assign any additional coaching, or direct Mr. Williams to engage in any further training to meet his job expectations.

62.     Notably, while the mid-year review was completed in January 2020, prior to Ms. Aranow's discriminatory comments as outlined in detail below, it was approved and submitted in March 2020, with no reference to Mr. Williams failing to meet any job expectations.

**Ms. Aranow Discriminates Against Mr. Williams and Derails his Career**

63.     On January 15, 2020, during a meeting to discuss Mr. Williams' mid-year review, Ms. Aranow—Mr. Williams' coach—made inappropriate comments about Mr. Williams' sexual orientation and marriage to a man.

64.     Specifically, toward the end of the meeting to discuss Mr. Williams' mid-year review, Ms. Aranow deviated from their normal practice of discussing cases and instead initiated a conversation with Mr. Williams about his personal life.

65.     Ms. Aranow began by saying "this is kind of tricky and I'm sure you will have a reaction to this, but I'm going to say it" and she proceeded to warn Mr. Williams about being open

10

with the fact that he has a husband, as opposed to a wife. Ms. Aranow made it clear that Mr. Williams could not share any information about his spouse because he was gay and that such disclosure would not be tolerated. Specifically, Ms. Aranow stated that Mr. Williams should not share any information about being married to a man with his DFS colleagues because Ms. Aranow was aware of several individual in the department who were "not okay" with it.

66.     Specifically, Ms. Aranow told Mr. Williams to be more "self-aware and cautioned him on what he shares as some people in the agency may not be comfortable with it."

67.     In response to Ms. Aranow's comment, Mr. Williams explained to her that he was legally married and had a right to share this if he chose. Ms. Aranow responded that when Mr. Williams first shared this information with her, she felt he was trying to force his lifestyle on her, and that Mr. Williams was trying to challenge or test her.

68.     As the discussion continued, Ms. Aranow said that if Mr. Williams chose to disclose that he is a gay married man, he must be willing to accept the consequences that come with it.

69.     For example, Ms. Aranow warned Mr. Williams that she was aware of County workers that had "transgenders" on their caseload and refused to work with them.

70.     Ms. Aranow also spoke of the "reality" of how many people at the County, and in society in general, have problems with gay and transgender individuals.

71.     Mr. Williams was shocked by Ms. Aranow's comments, and embarrassed and humiliated that someone he considered to be his superior condemned his marriage and sexual orientation.

72.    However, following these comments regarding Mr. Williams' openness about his sexual orientation and husband, it became clear to Mr. Williams that Ms. Aranow acted in the ineffective manner that she did as a coach because Mr. Williams is a gay man.

**Mr. Williams Complains Regarding Ms. Aranow's
Discriminatory Comments and Behavior**

73.    Mr. Williams contemporaneously documented the January 15th conversation with Ms. Aranow in its entirety and provided it to Human Resources ("HR") on January 21, 2020.

74.    As a result of Ms. Aranow's comments, on January 16, 2020, Mr. Williams complained to both his supervisor, Ms. DeMijango, and HR about Ms. Aranow's discriminatory comments and treatment.

75.    Specifically, Mr. Williams told Ms. DeMijango that he would be making a complaint to HR and the EEOC. Ms. DeMijango acknowledged and supported Mr. Williams' plan and cancelled Mr. Williams' final scheduled meeting with Ms. Aranow.

76.    On January 16, 2020, Mr. Williams also met with HR Specialist Khamla Kawahara. After sharing his experience, Ms. Kawahara categorized Ms. Aranow's behavior and comment as discriminatory.

77.    Ms. Kawahara informed Mr. Williams that she would share the information with her supervisor, HR Manager Robyn Walden, for further guidance. Ms. Kawahara further informed Mr. Williams that Ms. Walden would reach out to him to conduct an official interview. However, this never happened.

78.    Moreover, despite agreeing that Ms. Aranow's comments and behavior constituted discrimination, Ms. Kawahara asked Mr. Williams not to go to the EEOC and to instead allow the department to manage the situation in-house.

12

79.     On January 21, 2020, a mere few days later, Mr. Williams filed a formal complaint regarding Ms. Aranow's discriminatory statements and behavior.

80.     On January 30, 2020, Mr. Williams was invited to meet with Ms. Walden and Ms. Kawahara. Mr. Williams was neither interviewed nor asked any additional questions about his complaint regarding Ms. Aranow's discriminatory comments and behavior.

81.     Instead, during the January 30th meeting, Ms. Walden informed Mr. Williams that she had met with Ms. Aranow for several hours and determined her actions were not discriminatory.

82.     Ms. Walden stated that Ms. Aranow had "good intentions" and asked whether Mr. Williams would meet with Ms. Aranow and HR together so that Ms. Aranow could explain her intentions. Mr. Williams declined this offer.

83.     Further, in Ms. Walden and Ms. Kawahara's notes regarding their January 30th follow-up with Mr. Williams, they repeatedly refer to Mr. Williams as "hypervigilant," suggesting that he was being too sensitive regarding Ms. Aranow's discriminatory comments.

84.     Mr. Williams was informed that Ms. Aranow was directed to participate in coaching around cultural diversity.

85.     Upon information and belief, Ms. Aranow never participated in this coaching.

**Mr. Williams was Never Informed of His Right to File a Complaint with OHREP and DFS Failed to Comply with the Directions of PPM No. 39-06**

86.     Mr. Williams was never advised of his right to make a complaint to the Office of Human Rights and Equity Programs ("OHREP") to file a complaint.

87.     Personnel/Payroll Administration Policy and Procedures Memorandum ("PPM") No. 39-06 Section 4-B provides that "appointing authorities; department, agency, and office heads; and all other supervisory agencies have an affirmative duty to report conduct that is reported to

them or that they witness if the conduct, even if not severe or pervasive, is alleged to be discriminatory, harassing, or retaliatory."

88.     This duty includes ensuring that a prompt and thorough investigation is conducted in accordance with Section 6.C of this policy and taking appropriate action to resolve the matter.

89.     According to Section 6.C iv of PPM No. 39-06, the department may have the complaint investigated within the department or may refer the complaint to OHREP for investigation.

90.     Regardless of whether the investigation is performed within the department or by OHREP, the department director must ensure the complaint is investigated and resolved and remains responsible for taking corrective action, including disciplinary action as appropriate.

91.     Department directors must report all complaints of harassment, discrimination, or retaliation occurring within their departments immediately upon receipt of the complaint to OHREP, as well as report the outcome of the department's investigation and provide a copy of the investigation to OHREP.

92.     On May 27, 2020, Mr. Williams made a request through the Virginia Freedom of Information Act for documents that support DFS' compliance with the directives from PPM No. 39-06.

93.     The document produced by the County contains no evidence that OHREP was notified of Mr. Williams' complaint, or that a formal investigative report was generated by or shared with OHREP.

**Defendants Focus on Scrutinizing Mr. Williams Instead of
Counseling Ms. Aranow and Mr. Williams Receives an Unsatisfactory
Service Separation and is Wrongfully Terminated**

94.     As a result of Mr. Williams' complaint to HR, Defendants subjected Mr. Williams to unlawful retaliation.

95.     Instead of counseling Ms. Aranow, Defendants began scrutinizing Mr. Williams' work and ultimately put him on administrative leave on April 30, 2020 with no explanation, "to conduct a thorough investigation concerning the appropriate handling of [Mr. Williams'] child abuse and neglect case referrals[.]"

96.     However, the County had already conducted this investigation prior to Mr. Williams being placed on administrative leave. The investigation into Mr. Williams' case load occurred between April 20–24, 2020—*i.e.*, at least six (6) days prior to Mr. Williams being placed on administrative leave to supposedly conduct the already-conducted investigation.

97.     Less than four (4) months after Mr. Williams complained of discrimination, on May 6, 2020, Defendants summarily fired him, when Mr. Williams received an Unsatisfactory Service Separation, whereby terminating his employment.

98.     The memorandum imposing Mr. Williams' Unsatisfactory Service Separation (the "Memorandum"), from Michael A. Becketts, Director of DFS, states that Ms. DeMijango expressed concerns that Mr. Williams' performance was not improving, despite coaching attempts, on his mid-year probationary review.

99.     However, as outlined in detail above and herein, there is no such language contained in said mid-year review. In actuality, Mr. Williams passed his mid-year evaluation by receiving all "Meets-Development Opportunity" and Mr. Williams was praised for his work leading up to the evaluation.

100.    The Memorandum is riddled with other inaccurate representations and misstated facts, including but not limited to:

a. Stating that Ms. DeMijango mandated that Mr. Williams receive additional coaching in November 2019. Mr. Williams himself asked for additional support, he was never mandated to receive it.

b. Stating that on September 23, 2019, Ms. DeMijango supplied Mr. Williams with a template to help him structure his weekly one-on-one supervisions with his CPS specialists, and to help him extract crucial information on safety and risk factors so he could provide appropriate guidance on next steps to his CPS specialists. The "template" Ms. DeMijango provided on September 29, 2019, at the beginning of Mr. Williams' employment with the County, was a half-page Word document with general goals for supervising staff.

c. There are no training efforts listed in the notice post-November 4, 2019.

d. Stating that Ms. DeMijango expressed concerns regarding Mr. Williams' performance in his mid-year review in January and February 2020. As outlined in detail above and herein, Mr. Williams met all expectations, showed continuing improvement, and was eligible to become a permanent County employee at the time of his mid-year review and meetings regarding the same.

101. Likewise, any comments regarding Mr. Williams' performance were not raised during any previous performance evaluations or reviews and are not supported by the facts.

102. Mr. Williams was never put on notice that he was not meeting expectations or in danger of being terminated.

103. Instead, Mr. Williams was placed on administrative leave, with no explanation, just a few short months after making his complaint to HR.

16

104. Then, less than one (1) week after being placed on administrative leave, Defendants summarily fired Mr. Williams for alleged unsatisfactory performance, in retaliation for him complaining to HR about Ms. Aranow's discriminatory comments and treatment of him.

105. The Memorandum further alleged numerous false allegations regarding Mr. Williams' performance that are easily refuted upon examination of the case files.

106. No child was found to be harmed by these alleged deficiencies in Mr. Williams' unit's paperwork.

107. Further, even the administrative portion of these case files was done properly.

108. The allegations were fabricated to permit DFS to terminate Mr. Williams for engaging in protected activity. Mr. Williams was wrongfully terminated in the height of the COVID-19 Pandemic, making it difficult for him to find a comparable job. Despite his best efforts, Mr. Williams was not able to obtain comparable work locally and he and his spouse were forced to re-locate to South Carolina, where Mr. Williams' family resided. He and his spouse lived with Mr. Williams' mother until Mr. Williams was able to find another job. Unfortunately, the position he was finally able to obtain paid less than fifty percent (50%) of his DFS salary.

### FIRST CAUSE OF ACTION
**Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. § 2000e-2)**

109. Plaintiff adopts and incorporates paragraphs 1 through 108 above as if fully set forth herein.

110. Defendants violated Title VII by subjecting Mr. Williams to sex discrimination based on his sexual orientation during the course of his employment with DFS.

111. Mr. Williams is a member of a protected class as a gay male and was qualified for his position when Defendants fired him. Specifically, as stated above, Mr. Williams was qualified for his position as demonstrated by his track record prior to switching to DFS from the District of

17

Columbia, his mid-year review, and his 17 years without any performance issues until the ones alleged by DFS.

112.    As stated above, Mr. Williams is an openly gay male and is married to a man.

113.    At all times, Mr. Williams' DFS supervisors and colleagues were aware of his sexual orientation and the fact that he was married to a man.

114.    Mr. Williams' was treated differently than his peers by both Ms. DeMijango and Ms. Aranow because he is a gay male and was open about his marriage to his husband.

115.    Defendants, through Sonia Aranow, made discriminatory comments to Mr. Williams regarding his sexual orientation.

116.    For example, on January 15, 2020, toward the end of a meeting to discuss Mr. Williams' mid-year review, Ms. Aranow deviated from their normal practice of discussing cases and instead initiated a conversation with Mr. Williams about his personal life.

117.    Ms. Aranow began by saying "this is kind of tricky and I'm sure you will have a reaction to this, but I'm going to say it" and she proceeded to warn Mr. Williams about being open with the fact that he has a husband, as opposed to a wife.

118.    In response to Ms. Aranow's comment, Mr. Williams explained to her that he was legally married and had a right to share this if he chose. Ms. Aranow responded that when Mr. Williams first shared this information with her, she felt he was trying to force his lifestyle on her, and that Mr. Williams was trying to challenge or test her.

119.    As the discussion continued, Ms. Aranow said that if Mr. Williams chose to disclose that he is a gay married man, he must be willing to accept the consequences that come with it.

120. Mr. Williams was shocked by Ms. Aranow's comments, and embarrassed and humiliated that someone he considered to be his superior condemned his marriage and sexual orientation.

121. Ms. Aranow had an express obligation to train, assess, and supervise Mr. Williams in an unbiased manner without regard to his sexual orientation. She failed to do so.

122. Ms. Aranow's disengagement with respect to coaching Mr. Williams, driven by her disdain for his sexual orientation contributed to Ms. DeMijango's belief that Mr. Williams "performance was not improving, despite coaching attempts, on his mid-year probationary evaluation."

123. Mr. Williams suffered damages as a result of Defendants' unlawful discriminatory actions, including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

124. Defendants, and their agent—Sonia Aranow—intentionally violated Mr. Williams' rights under Title VII, with malice or reckless indifference, and, as a result, are liable for punitive damages.

## SECOND CAUSE OF ACTION
### Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e-2)

125. Plaintiff adopts and incorporates paragraphs 1 through 108 above as if fully set forth herein.

126. Defendants violated Title VII by subjecting Mr. Williams to a hostile work environment during the course of his employment with DFS by engaging Ms. Aranow and failing to act when Mr. Edwards alerted DFS to Ms. Aranow's unlawful behavior.

127. Defendants, through both Ms. Aranow and Ms. DeMijango, created a hostile work environment for Mr. Williams up to and through the date of his termination.

19

128.   As explained in detail above, as of 2020, Mr. Williams had been a social worker for 17 years and had never experienced such an unsupportive and unforgiving work environment.

129.   Ms. Aranow's behavior was unwelcome. Mr. Williams described Ms. Aranow's behavior as "oppressive" and "discriminatory". Immediately following Mr. Williams' conversation with Ms. Aranow, he went to his direct supervisor to inform her of his intention to file a complaint with HR and the EEOC.

130.   DFS's practices and expectations were unrealistic and set Mr. Williams up for failure, solely because of his status as a gay male.

131.   As outlined in detail above, Ms. Aranow's hostile behavior continued for months and was demoralizing to Mr. Williams.

132.   Mr. Williams' was treated differently than his peers by both Ms. DeMijango and Ms. Aranow because he is a gay male and was open about his marriage to his husband.

133.   Following Ms. Aranow's comments regarding keeping his marriage and sexual orientation a secret, Mr. Williams began to understand why he was singled out by management and subjected to harsh treatment by his supervisors every day that he was employed by DFS.

134.   Mr. Williams very quickly brought this to Defendants' attention, as early as November 2019, when he met with Ms. Erikson.

135.   However, Defendants never conducted an investigation into Mr. Williams' concerns regarding Ms. Aranow's conduct and treatment of him. Instead, Defendants condoned it and allowed it to continue.

136.   As outlined in detail above, Mr. Williams complained to HR about Ms. Aranow's comments and behavior in January 2021. However, Defendants again refused to condemn Ms. Aranow's behavior.

137. In doing so, Defendants further fostered an environment where Mr. Williams was discriminated against on the basis of his sexual orientation and subjected to a hostile work environment based on his sexual orientation, as evidenced by the lack of investigation into Ms. Aranow's discriminatory comments and Defendants' response to the same.

138. Moreover, Ms. Walden, the HR Manager, not only failed to conduct an interview with Mr. Williams concerning the discriminatory comments that Ms. Aranow made to him about his sexual orientation, but she further very openly indicated that she felt that Ms. Aranow's comments were not discriminatory.

139. Therefore, Defendants are liable for Ms. Aranow's harassing and discriminatory conduct towards Mr. Williams as Defendants were put on notice almost immediately that Ms. Aranow treated Mr. Williams differently, failed to promptly investigate his concerns when he initially raised them, and further failed to respond with remedial action that was reasonably calculated to stop the months-long harassment faced by Mr. Williams.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of Title VII of the Civil Rights Act of 1964
### (42 U.S.C. § 2000e-3)

140. Plaintiff adopts and incorporates paragraphs 1 through 108 above as if fully set forth herein.

141. Mr. Williams engaged in protected activity when he objected to Defendants' discriminatory treatment and hostile work environment based on his sexual orientation.

142. Mr. Williams reasonably believed that Ms. Aranow's statements were unlawful and a violation of Title VII, as she explicitly warned him not to disclose his sexual orientation or marital status, or else he must be willing to accept the consequences that come with it.

143. Mr. Williams followed the appropriate County protocol for reporting discrimination.

144.    Defendants not only failed to properly, if at all, investigate his complaint, as required by PPM No. 39-06, but also terminated Mr. Williams for engaging in protected activity.

145.    Mr. Williams contemporaneously documented his January 15, 2020 conversation with Ms. Aranow in its entirety and provided it to Human Resources ("HR") on January 21, 2020.

146.    On January 16, 2020, one day after the conversation with Ms. Aranow took place, Mr. Williams engaged in protected activity by contacting his supervisor and informing her that he would be making a complaint to HR and the EEOC. Mr. Williams' supervisor, Ms. DeMijango, acknowledged and supported Mr. Williams' plan and cancelled Mr. Williams' final scheduled meeting with Ms. Aranow.

147.    On January 16, 2020, Mr. Williams met with HR specialist Khamla Kawahara.

148.    After sharing his experience, Ms. Kawahara categorized Ms. Aranow's behavior as discriminatory. Ms. Kawahara informed Mr. Williams that she would share the information with her supervisor, HR Manager Robyn Walden, for further guidance and that Ms. Walden would reach out to Mr. Williams to conduct an official interview.

149.    Ms. Walden never reached out to Mr. Williams to conduct a formal interview.

150.    Moreover, despite Ms. Kawahara agreeing that Ms. Aranow's comments and behavior constituted discrimination, Ms. Kawahara asked Mr. Williams not go to the EEOC and instead to allow the department to manage the situation in-house.

151.    Mr. Williams was never advised of his right to make a complaint to OHREP to file a complaint.

152.    On January 21, 2020, Mr. Williams again engaged in protected activity when he filed a formal complaint with HR regarding Ms. Aranow's discriminatory comments and treatment

22

based on his sexual orientation and marriage to a man. Mr. Williams further provided HR with his documentation of the entire conversation from January 15th as an attachment to his complaint.

153.    After an "investigation," which consisted of HR speaking only with Ms. Aranow (the accused) and not Mr. Williams (the complainant), HR concluded that Ms. Aranow's comments were not discriminatory because Ms. Aranow "meant well" when she warned Mr. Williams that if he continued to openly share that he is a legally married gay man, he must be willing to accept the consequences that come with it.

154.    Rather than conduct a full investigation and/or counsel Ms. Aranow, DFS' response to Mr. Williams' complaint was to place him under increased scrutiny, to place him on administrative leave, and to terminate him just a few months after he complained of sexual orientation discrimination and a hostile work environment based on his sexual orientation.

155.    DFS summarily fired Mr. Williams on May 6, 2020 purportedly because Mr. Williams failed to meet the minimum standards of performance for his position as a CPS Supervisor.

156.    DFS' stated reason for terminating Mr. Williams' employment is pretextual and baseless. DFS fired Mr. Williams because he complained of sex discrimination and a hostile work environment based on his sexual orientation in January 2020.

157.    Mr. Williams was on track for a permanent position with the County/DFS through January 15, 2020.

158.    However, once he made the complaint to HR, Mr. Williams was treated differently, held to an even higher standard, and ultimately fired just a few short months later for allegedly failing to meet performance expectations.

159.    Mr. Williams was retaliated against for engaging in protected activity by objecting to and complaining of sex discrimination and a hostile work environment based on his sexual orientation.

160.    By the acts and omissions alleged above, Defendants intentionally deprived Mr. Williams of equal employment opportunities, and otherwise adversely affected his status as an employee.

161.    As a direct, proximate, and foreseeable result of Defendants' unlawful conduct, Mr. Williams has suffered, and continues to suffer, damages including emotional distress, past and future lost wages and benefits, and the costs of bringing this action.

162.    Defendants intentionally violated Mr. Williams' rights under Title VII, with malice or reckless indifference, and, as a result, are liable for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Edward M. Williams respectfully requests that this Court:

A.    Award Plaintiff for his past and future lost wages and benefits, plus interest;

B.    In lieu of reinstatement, award Plaintiff his front pay, including benefits;

C.    Award Plaintiff's reasonable attorneys' fees and costs connected with this action; and

D.    Grant such other and further relief as this Court may deem just and proper.

Dated: July 27, 2023                    Respectfully submitted,

/s/ Roya Vasseghi
Roya Vasseghi (VSB No. 85122)
VASSEGHI BUDD PLLC
9663-A Main Street
Fairfax, VA 22031
(703) 215-9358 Tel.
(703) 563-7401 Fax

24

roya@vasseghibuddlaw.com

*Counsel for Plaintiff Edward M. Williams*